Good morning. I'm Peter Fells. I represent Charles James. May it please the court. First of all, I would like to reserve approximately ten minutes for rebuttal. I'm going to speak for probably five or seven minutes and then I'd like to take your questions or obviously you can cut in and ask me questions. I want to start by pointing out that Judge Wallace basically made my case already in the previous case regarding the Northwest Airlines employee because this is a summary judgment dismissal case and the argument basically is that there were material facts and evidence. There needs to be very little evidence to establish a prima facie case and go to the jury on each of Mr. James' claims. What I do want to address to begin with is our Section 1981 claim for a couple of reasons. Number one, because I'll concede that I didn't elucidate it very clearly at the trial court level. And secondly, because it highlights the issues in the case. There was ample evidence in the record that C-Tran had an unofficial policy which required its bus drivers to endure racial epithets and other racial hostility from their customers. This evidence consists of, for example, the former director, Mr. Hartley, telling Mr. James when he was first hired that he should expect to be called racial names as a driver, and a judge, Mr. Hartley, again at a later time, telling him, didn't I tell you you should expect this and you need to learn to live with it. It also occurred when Supervisor Combs told Mr. James and his co-worker, another black bus driver, Oliver Jeffries, that they would be fired if they continued to complain about the racial hostility from the customers. And then, of course, the incident that got Mr. James in trouble was when Supervisors Golson and Graham both told him that he complained too much about racial hostility from customers, that if he didn't enjoy it, he should go and get another job, and that when he did complain, he shouldn't sound angry that people were calling him, as he called it, the N-word, which this court has recognized is a highly offensive word to use to African-Americans. Now, CEO Lynn Griffith and Lynn Halsey both ratified this policy when they investigated Mr. James's complaints about what Golson and Graham had told him, and they concluded that Graham and Golson had done nothing wrong. So the evidence is there that there was this unofficial policy. Now, CTRAN says it's an unofficial policy, but CTRAN says it's an unofficial policy. Now, Mr. James's official policy was we're going to support you, and you shouldn't have to put up with racial hostility from customers, but Mr. James made a case that there was an unofficial policy that, in fact, he was required to endure and tolerate racial hostility from customers during the course of his career. Now, as I said, we probably didn't articulate the policy or custom aspect of that as clearly as we should have in the trial court, but we didn't put up with racial hostility from customers. Now, we didn't have the burden because the defendants did not carry their burden of production when they moved against our Section 1981 claim, and this is the Nissan Fire and Marine Insurance case that's cited in our reply brief, which says that if a party moves for summary judgment against an issue, they have to produce some evidence to negate the plaintiff's claim. All that the defendants said in their brief, and this is their memorandum in support of summary judgment, they said there's no policy or custom of CTRAN authorizing or condoning discriminatory employment practices, but they presented no evidence to support their claim. So we weren't really able to negotiate with the court the argument that this informal policy did not exist. And I think the case cited by Nissan Fire and Marine Insurance, which is Addycos v. Crest, which is the US Supreme Court case, is right on point, because that's a civil rights case. The store owners said there's no evidence that the police, and we were in conspiracy. And the Supreme Court said the defendant has the responsibility to produce evidence that negates any possibility that the plaintiff's claim is correct. And because they didn't produce evidence that there couldn't have been any involvement between the police and the store, the defendant or, excuse me, the plaintiff was allowed to go ahead. So I don't think we even had a burden. And I think the reason that the plaintiff had to go ahead and go ahead and do that was because they were not willing to do that, and it was not a matter of whether they were willing to do it or not.   I'm sorry. I'm sorry. Could you entertain a question? Yes. I'm sorry.  I want to ask you about the retaliation claim. Certainly. It's alleged that this PPI was part of the retaliation claim to show the prima facie case. Correct. As I understand it, the PIP was alleged to be a work improvement process. Correct. But the record shows the union agreed that it was a work improvement process. What evidence do we have based upon both the employer and the union concluding it's a work improvement process? Well, first of all, I disagree with the defendant's characterization of the union's response to the PIP. The union did conclude that it was a training program and, therefore, could not be aggrieved under the collective bargaining agreement. But that doesn't make it conclusively so that it was merely a training program. In fact, I think it was more like a probation, somewhat like in the last case, I think it was Judge Silverman raised the issue, that they put specific conditions on him that he had to meet in order to retain his job. And one of the indicators of that, for example, is that he was subjected to more stringent requirements under the PIP than he was under the collective bargaining agreement. For example, under their normal policy regarding customer comments, an employee could have up to eight customer comments of the same nature that were confirmed before the employee would be discharged. Under the PIP, Mr. James, that was reduced to four. As initially proposed, they wanted to find him insubordinate after just one act of insubordination. Whereas the collective bargaining agreement had two. Now, granted, the union managed to get that one changed, but it shows that the nature of it was retaliatory in that they tried to reduce his rights, his ordinary rights as an employee. Did you raise at the summary judgment the PIP is retaliatory? Yes, I believe we did. The other side says it was not raised at summary judgment, and therefore it's waived. Can you show me in the record so that I can verify which side is correct of where you raised the PIP as retaliation? Well, I'll have to go to my brief in... Well, you can wait and do it in rebuttal. You're saving ten minutes. Maybe during that time you could show me, because one side or the other is incorrect on that. Okay, thank you. Let me ask a related question. You were representing him at the time he was put into the PIP, weren't you? I believe I was. In fact, you suggested that the PIP included some role-playing, didn't you? Well, that was one small suggestion. Was there ever a complaint about the PIP at the time? Mr. James attempted to grieve it. The union determined that it was not subject to grievance. How about from counsel? Well, I guess if we were going to complain, we could have made an EEOC complaint or something along those lines. And that did not happen? Was there an EEOC charge made about it? Later, yes, that was included in the EEOC charge. It was not at that time. This was a very difficult thing because there was a meeting where I represented Mr. James, and they brought in evidence about what I allegedly said, and I didn't want to be a witness in the case, so I tried not to address what happened at that meeting because it would put me in a very difficult position. So I can't really answer it because I didn't put in the record what happened at that meeting. But there was a meeting. His discharge was some seven months after the PIP. From November. Yes, the actual effective date of the discharge, I think they actually found him insubordinate first in February, and the PIP was instituted in November. Isn't seven months a bit of a large gap of time to draw an inference that the PIP was the cause? We – it is our position, and again, I think the defense misconstrued our position. It's our position not that the PIP was the cause of his discharge, but that his discharge was retaliation for his opposition to the PIP. The PIP was an unlawful employment action from our position because it was retaliation for his complaints about what Graham and Golsan said and about the entire history of being subjected to racial harassment. He had a right to oppose a discriminatory action by his employer, and then he was discharged for opposing it, and they discharged him in the spring of 2002 by finding him insubordinate because he would not go along with the PIP. So that's the connection. We're not saying he was discharged because of the PIP itself, but because of his ongoing opposition to the PIP, which went along for that entire period of time. It was only supposed to last 90 days, but they made it last for a much longer time. Another incident that shows that the PIP was an adverse employment action was he was on unpaid or, excuse me, paid administrative leave during part of that PIP because they didn't just let him go back to work. They couldn't figure out what else to do with him, so they put him on leave, which is another indication that it was an adverse employment action. Are there other... I was going to say good afternoon, but I think it's still morning. I'm Beth Knarr. I'm here on behalf of CTRAN and Lynn Griffith. I'll first address the harassment claim. First of all, the 1981 claim was not addressed whatsoever in the opposition to the summary judgment. According to Mr. Feltz, the reason is because our summary judgment motion wasn't strong enough on that point. If that is his argument, he should have at least put it in the opposition so that we were on notice that we had a burden that he felt was not sustained and submitted in the reply. But again, there was absolutely nothing in the opposition. Second, let's just talk about harassment for a minute. The incidents that he talks about in terms of creating this policy or practice, the 1995 comment by Mr. Hartley, outside the statute of limitations, and if you look at the record, which I urge you to do, Mr. Hartley did not mention anything about race names. His testimony was, you are a bus driver. You may be called names in this job. There is no linkage to race. Mr. Combs, again, a supervisor, commented outside the statute of limitations period. Mr. James admits in his deposition, never mentions race, never mentions you will lose your job for making complaints. In fact, the undisputed record, which has not been disputed even for purposes of appeal, is that CTRAN told Mr. James repeatedly, if you have concerns, report them. And Mr. James acknowledges that. Of the 11 incidences where he reported a passenger during his seven years of employment with the agency made a racial name to him, the CTRAN sent a supervisor. They investigated. They cannot retain a passenger on the bus. Five of those passengers got off the bus. We weren't able to locate them. But the supervisor said to Mr. James, if you see them again, contact dispatch. Of the six that we were able to locate and identify, they were counseled or excluded from riding the bus. Mr. James does not dispute that, as the district court found. What he said is that we need to do something else. But the test is that we prevented 100%. That is not the test. The test is, was the agency's response reasonably likely to deter? And in this case, it certainly was. They have a complaint policy. They affirmatively and repeatedly encouraged Mr. James to use that complaint policy. When he used it, they sent a supervisor out there to investigate, and they counseled and excluded passengers where appropriate. They installed security cameras, and they hired additional security to ensure that, yes, you are dealing with the public. But where we can, we will do everything to deter this behavior from happening again and control it where we can. And that's why there is a different standard when we're talking about third parties, as distinguished from supervisors certainly, and employees in particular, when you can go to the workplace, you know where the employee is. You can discipline, you can control their behavior. CTRAN did what it could to control the third party's behavior, as the district court correctly found. With respect to coworkers, we have two situations that Mr. James relies upon. First is the Bobby incident, 2001, where he reports that Michael Bobby, an operator, made an inappropriate comment. Vi Vernon, the African-American's dispatch supervisor, investigates it, even though Mr. James tells her not to. She counsels Mr. Bobby. He immediately apologizes. No further incidents. The other is a poster that is taken down as soon as the agency received notice of it. That's all we have. And the issue on appeal for harassment is, well, should the agency have attributed every conflict that he endured or encountered as attributable to his race? The agency has a right to rely on what the individual tells them. If the individual does not link it to race, the agency can't take any action. In this case, a bus driver. If there's a conflict, I can't give you change. You don't have change with the fare box. I can't give you change for that. That's against our policy. A conflict arises. Is the agency to assume that's because of race? No. If the operator tells them, they take action, and that's what they did here. I think that on the harassment case, therefore, I think the district court correctly found that it was not the 11 incidences and the limited co-worker was not severe pervasive to alter the working conditions, and that the agency took prompt remedial action. At a minimum, there's no evidence that it acquiesced or ratified the conduct. Let's go to the next slide. Even if the PIP is a tangible employment action that no reasonable trier of fact could ever conclude. Exactly. And let's first talk about is it an adverse employment action. Ray said it has to be reasonably likely to deter. It was a training program. The union said it was a training program. The union representative said we did not agree because it did not harm Mr. James. Mr. James expert testified. These are common tools used in the workplace to ensure that the individual is given the tools to resolve whatever the issue is, or at least identify what the issue is. And that's what happened here. But he had to comply with the PIP. He had to comply. And the issue here is insubordination. Right. Because ultimately he was fired, allegedly, for not. Exactly. The insubordination policy, though. Satisfying the requirements of the PIP. The insubordination policy set forth in the PIP is exactly the same that applies to the entire workforce. Ms. Griffith was new. The union said. Not every member of the workforce was on a PIP, correct? Correct. But every member of the workforce has to comply with directives, act respectful, not engage. Is the PIP essentially a form of probation? No. I don't think so. Because, again, the PIP required that he, there wasn't any mechanism to say, okay, if you don't improve, this is going to happen. This is, let's talk about what's going on in your workplace. And let's give you the tools to ensure that whatever the issue is, you're either able to deescalate it or avoid it. The only criteria is subordination. And that policy applies throughout the workplace. And with respect to Graves and Brooks and the case that had come down and talked about an adverse employment action, they've consistently said alteration in job responsibilities, which is what this was, come in and do training, is not an adverse employment action. The reason that it did stop, and we talk about Mone and we'll talk about whether the causation or the pretext issue has been assessed, talk about the interceding events that dissipate any inference that it was problematic. We've got, do you need a new supervisor? No. Do you want to bring somebody with you? Do you want to bring a union rep? Fine. Do you want to bring your friends? Scott May? Fine. Do what will make this effective. If it's not effective, and again, November, there's absolutely not one dispute about CTAN's recitation of the facts from when the PIP was set up through the time when he refused to read the last chance agreement. So all those facts must be accepted as truth. They've never been disputed. So offer supervisor, no. Offer to bring a friend, no. This isn't working. Let's meet with your attorney. Does your attorney have some ideas? Attorney suggests some ideas. We implement those ideas. And again, insubordinate, refusal to participate because, as Mr. James said throughout, I don't do what I don't want to do. So Mr. Fells argues that, okay, if this is an adverse employment action, he was protected in his opposition. There's no question that if an individual wants to complain about treatment they believe is illegal, that is protected activity. That does not give an employee carte blanche to decide how they're going to oppose that behavior. We don't say to a sexual harassment victim, assault your harasser. We say, bring it to somebody's attention so they can resolve it. He took the matter into his own hands and engaged in self-help. I think the arbitration decision is very persuasive on this point because it talks about our label principles mean obey now, grieve later. If he had an issue, he had a form to address it in rather than, or he could do it concurrently. There's nothing that prohibited him, absent a safety concern, from complying with the directives and grieving it in the appropriate form. That is not protected activity under any such imagination to engage in, as he admitted, belligerent, disrespectful, discourteous, and insubordinate behavior. Again, I think that when we look at the termination, we've got an eight-month gap. It doesn't meet the causation inference. Absent something more, and we don't have anything more. Even if you satisfy causation, then you're looking at, okay, have they established a pretext? Have they satisfied their burden in showing that the explanation was wrong or there's a retaliatory motive? Neither argument was sustained in this case. has not ever disputed that he was terminated for his insubordinate conduct, nor is there any evidence that there was a retaliatory motive. So then that's why we see this argument, well, it's the PIP in the first place, because that's the closest temporal gap. If I can say, well, I met with Lynn Griffith, and soon I got the PIP, and that's my adverse employment action, then that close proximity sustains it, but it doesn't, because, again, we don't believe the PIP was an adverse employment action, but even if established as a prima facie case, they have to overcome the illegitimate explanation of why we got where we are. Never disputed that Lynn Griffith has looked and found 73 complaints over a three-year period of time, unprecedented, seven times more than the average, 26 more than the next highest number of an operator having a concern. Certainly there was a legitimate reason to say, let's sit down, find out what the concern is here. I also think this case is somewhat unique, and I think we need to pull back and look at the context, because this is a situation where we've got two bodies of law. We've got our McDonnell-Douglas burden shifting that's well established under Title VII. What are the standards for prima facie? What are the standards for establishing pretext? We also have a situation where this came to us after being fully litigated in arbitration, and the district court here, looking at the Collins case in the Second Circuit and understand that the guidance provided by the United States Supreme Court and Alexander said, how do we reconcile these two bodies of law? What balance do we strike? And I think the district court struck the appropriate balance, that under the facts and circumstances, you can give it the weight it warrants. And in this case, we have a situation where Mr. James voluntarily chose to agree the termination and the suspension in arbitration, fully litigated with the counsel of his choice, fully able to present at whatever arguments he wanted to do and, in fact, made the same arguments in that form as he made in this form, never argues that the arbitrator was biased, never argues that the arbitrator didn't have all the facts or somehow made a mistake. Now, I'm not saying in any way that that's res judicata. It's not. But it does come into consideration in determining whether the prima facie burden has been met or if the pretext has been established. And in this case, it hasn't. The district court in this case then went to the next step and said, I've looked at the arbitration decision, but even under the minimal standard required for summary judgment, Mr. James has failed to even meet that low threshold. And applying that standard then found no reasonable jury could find causation, no reasonable jury could find pretext. I think that for those reasons, the district court's decision is correct. Thank you very much. Mr. Fels, you have some time left. Thank you. Is this my time? 835. Judge Wallace, in answer to your question, in my brief, which was at the excerpts of the record, page 217, and the next couple of pages after that, we addressed the retaliatory aspects of the implementation of the plan. Excerpt 217. Right. 217 and the next page or two, we discussed that issue. Now, of course, it's our position that there are material facts in dispute, and I disagree with a number of the facts that are recited by counsel. We've addressed those in our brief, and I don't need to get into each one of them. I do want to respond to several things they said. First of all, I agree that the test is whether the employer's response to the employee's complaints about hostile work environment was reasonably likely to deter future hostility. And our position is that all that CTRAN did was attempt to contact offending passengers. They admitted that they only contacted about half of those, but there were very little efforts made to reduce the overall number of hostile remarks made by passengers. And this is what Mr. James was complaining about all the time or all along. He was saying, look, I'm continually subjected to customers calling me nigger or other offensive words or spitting at me or threatening me just because I do something simple like ask them to pay the fare. This is not right. I shouldn't have to put up with it. And while CTRAN may have made some efforts to contact offending passengers, there's very little other than the record shows that there was one poster that was on the bus that said there was prohibited bus conduct, but there's no evidence in the record about what conduct was prohibited or what the poster actually said. And the only other thing that they were supposed to do, I mean, they say if you have a troublemaker on the bus, report it and we'll take care of it. Well, I think the poster up, don't harass the driver. I mean, what are they supposed to do? I think they needed to take some more affirmative steps. Now, obviously, I don't have an expert. I'm not an expert on that. And I think it's the employer's burden. The employer is required by case law to figure out what they can do, what is reasonably likely to deter. For example, one of the things they could have done was hire an expert, told the expert, look, we've got this problem. Our drivers are complaining that they're being harassed by the customers. The female drivers were also complaining that they were being called sexually derogatory names by their customers. What can we do to reduce that incidence so there's more civility on the bus? That's one thing they could have done. An expert on bus civility? I would think it would be something on civility in the workplace or how to promote a more civil environment for your workers. The broader point, though, do I understand correctly that it's undisputed that their policy is if a bus driver is being harassed by troublemakers on the bus, there's a procedure where the bus driver can call headquarters and kick off the person off the bus? Well, that's their official policy. But remember, Mr. James is complaining that his supervisors were telling him don't call in so much. So the unofficial policy was don't call in. They told him call on a different line. They told him don't be angry when you call. He testified that a number of supervisors just told him don't call in so much. And that was, in fact, the issue when he had this meeting with Supervisors Olson and Graham. And obviously that evidence has to be taken as a verity for purposes of summary judgment. But getting back to the policy and what they did, they also had a policy that the driver was supposed to open the doors and let people off. So although the driver reported this passenger made an inappropriate comment, they said we'll send a supervisor out to check it out. By the time the supervisor got there, most of the time all the witnesses were gone and the offending passenger was gone. One of the things that they could have done, and then they would say, well, we can't do anything about it because we can't find the person and there are no witnesses. Well, one of the things they could have done, they could have come on the same bus the next day at the same time, talked to some of the passengers who are regular riders of the bus, and said, did you witness this incident yesterday? There's no evidence that they ever tried to do that. If they couldn't find witnesses on that day, they said, sorry, there's nothing we can do about it. It's another type of thing that they could have done. Is there evidence that Mr. James called and said, you know, the guy who was giving me a hard time yesterday is back on the bus today? Yes, he did do that on occasion. What happened then? I can't recall the exact facts of what happened. I think sometimes they were able to contact the offending passengers and sometimes they weren't. There are two incidents in the record. One incident is they contacted an offending passenger. They gave him a ride to the bus station, to the bus transit mall. When Mr. James got there, that rider then proceeded to taunt Mr. James. So that's an indication that the remedy was not effective. After Mr. James complained to Ms. Griffith, there was another incident where he complained about a passenger. Supervisor Golson came to investigate, went to talk to the passenger. The passenger denied having done it, and Golson came to Mr. James and said, well, he didn't do it. There's nothing else I can do. Didn't talk to any witnesses. Didn't investigate any further. And this was after Mr. James complained. Ms. Griffith said, we're going to and we want you to report. We're going to do something about it. We don't take this sort of thing lightly. Golson did nothing. So their unofficial policy really was different from their official policy, and that's why there's a 1981 case, and that's why the rest of the case should not have been dismissed. Thank you all very much for your attention. Thank you. Ms. Kennard, thank you as well. The case just argued is submitted. Okay. We'll take a five-minute break before we go to the last case. Thank you. All right. We'll have a break. This court stands in the defense of five minutes. Thank you.
judges: Wallace, Silverman, Paez